

**U.S. Department of Justice**

*Leah B. Foley*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (413) 785-0235*

*United States Courthouse*
*300 State Street, Suite 230*
*Springfield, Massachusetts 01105*

August 12, 2025

BY E-MAIL: law@davidyannetti.com

David R. Yannetti, Esq.
44 School Street, #1000A
Boston, MA 02108
Counsel to Jeannette Norman

Re: United States v. Louis R. Masaschi and Jeannette Norman
Criminal No. 23-30014-MGM

Dear Counsel:

The United States Attorney for the District of Massachusetts (the "U.S. Attorney") and your client, Jeannette Norman ("Defendant"), agree as follows, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

1. **Change of Plea**

No later than August 29, 2025 or as soon as practicable for the Court, Defendant will plead guilty to Counts One through Three of the Indictment:

   a. Count One: Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 371; and

   b. Counts Two and Three: Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2.

Defendant admits that Defendant committed the crimes specified in these counts and is in fact guilty of each one.

Defendant agrees to the accuracy of the attached Statement of Facts.

1
Initialed by Jeannette Norman: _____

The U.S. Attorney agrees to dismiss Count Four following the imposition of Defendant's sentence and not to charge any other violations in connection with Defendant's conduct set forth in the Statement of Facts.

2. <u>Penalties</u>

Defendant faces the following maximum penalties:

a. Count One: incarceration for five years; supervised release for three years; a fine of $250,000 or twice the gross gain or loss; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Indictment.

b. Counts Two and Three: incarceration for thirty years; supervised release for five years; a fine of $1,000,000 or twice the gross gain or loss; and a mandatory special assessment of $100.

Defendant understands that, if Defendant is not a United States citizen by birth, pleading guilty may affect Defendant's immigration status. Defendant agrees to plead guilty regardless of any potential immigration consequences, even if Defendant's plea results in being automatically removed from the United States.

3. <u>Sentencing Guidelines</u>

The U.S. Attorney agrees, based on the following calculations, that Defendant's total "offense level" under the Guidelines is 25:

a) Defendant's base offense level is 7 because Defendant was convicted of an offense referenced to this guideline and that offense of conviction has a statutory maximum term of imprisonment of 20 years or more (USSG §2B1.1(a)(1));

b) Defendant's offense level is increased by 20, because Defendant's offense involved a loss between $9,500,000 and $25,000,000 (USSG §2B1.1(b)(1)(K));

c) Defendant's offense level is increased by 2, because Defendant's offense involved 10 or more victims (USSG §2B1.1(b)(2)(A)(i));

d) Defendant's offense level is increased by 2, because Defendant's offense involved sophisticated means and Defendant intentionally engaged in or caused the conduct constituting sophisticated means (USSG §2B1.1(b)(10)(C));

2
Initialed by Jeannette Norman:

e) Defendant's offense level is increased by 2, because Defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense (USSG §2B1.1(b)(17)(A));

f) Defendant's offense level is decreased by 3, because Defendant was between a minor and minimal participant in the criminal activity (USSG §3B1.2);

g) Defendant's offense level is decreased by 2, because Defendant meets all of the criteria required for an adjustment for certain zero-point offenders (USSG §4C1.1(a)); and

h) Defendant's offense level is decreased by 3, because Defendant has accepted responsibility for Defendant's crimes (USSG § 3E1.1).

Defendant agrees with the U.S. Attorney's calculation but reserves the right to contest the two-level increase in items (c), (d), and (e) above.

Defendant understands that the Court is not required to follow this calculation or even to sentence Defendant within the Guidelines and that Defendant may not withdraw Defendant's guilty plea if Defendant disagrees with how the Court calculates the Guidelines or with the sentence the Court imposes.

Defendant also understands that the Government will object to any reduction in Defendant's sentence based on acceptance of responsibility if: (a) at sentencing, Defendant (directly or through counsel) indicates that Defendant does not fully accept responsibility for having engaged in the conduct underlying each of the elements of the crimes to which Defendant is pleading guilty; or (b) by the time of sentencing, Defendant has committed a new federal or state offense, or has in any way obstructed justice.

If, after signing this Agreement, Defendant's criminal history score or Criminal History Category is reduced, the U.S. Attorney reserves the right to seek an upward departure under the Guidelines.

Nothing in this Plea Agreement affects the U.S. Attorney's obligation to provide the Court and the U.S. Probation Office with accurate and complete information regarding this case.

4. <u>Sentence Recommendation</u>

The U.S. Attorney agrees to recommend the following sentence to the Court:

a) incarceration of 45 months;

3

Initialed by Jeannette Norman: _/s/_

b) a fine within the Guidelines sentencing range as calculated by the U.S. Attorney, unless the Court finds that Defendant is not able, and is not likely to become able, to pay a fine;

c) 36 months of supervised release;

d) a mandatory special assessment of $300, which Defendant must pay to the Clerk of the Court by the date of sentencing;

e) restitution of $20,099,295 as set forth below; and

f) forfeiture as set forth in Paragraph 7.

The U.S. Attorney agrees to recommend that Defendant serve her sentence consecutive with (either before or after) the sentence of Louis R. Masaschi in the above-captioned case.

Defendant agrees to pay a total of $20,099,295 in restitution as specified below:[1]

| Lender | Amount |
|---|---|
| Security Mutual Life Insurance Co. ("SMLI") | $ 1,554,378 |
| New York Income Partners, LLC ("NYIP") (LOU-17-001) | $ 1,463,051 |
| Freedom Credit Union ("FCU") | $ 5,370,037 |
| NYIP (LOU-17-002) | $ 530,058 |
| NYIP (LOU-17-003) | $ 3,647,352 |
| U.S. Income Partners, LLC ("USIP") | $ 793,822 |

---

[1] Defendant agrees that this restitution is accurate and correct based upon the attached agreed-to Statement of Facts, but reserves the right to seek a reduction in restitution, as to the specific victims referenced above, at sentencing if Defendant can substantiate this reduction based upon documentary evidence. Defendant agrees to provide such evidence to the Government no later than 60 days prior to sentencing to permit the Government the opportunity to present such evidence to the Lender and obtain the Lender's response. If any such reduction is permitted, the amount payable to each of the above-referenced victims would be reduced by the amount of the corresponding permissible reduction. Any entity or individual who made a payment resulting in such a reduction (other than Defendant), however, would be considered an additional victim that is owed restitution in the amount that such additional victim paid to the Lender on account of a restitution loss.

4
Initialed by Jeannette Norman

| Lender | Amount |
|---|---|
| Community Loan Servicing, LLC d/b/a Silver Hill Funding, LLC ("SHF") | $ 255,112 |
| SHF | $ 1,068,434 |
| Grand Coast Capital Fund I, LLC ("Grand Coast") | $ 300,115 |
| Grand Coast | $ 778,182 |
| Grand Coast | $ 561,005 |
| MCREIF SubREIT, LLC, d/b/a Money360 ("MCREIF") | $ 1,734,305 |
| Workers Credit Union ("WCU") | $ 2,043,444 |
| Total: | $20,099,295 |

Defendant agrees that all criminal monetary penalties, including special assessment, restitution, forfeiture, and/or fine imposed shall be due and payable immediately, and further agrees that any Court-ordered repayment schedule does not preclude further enforcement or collection by the United States.

5.   Waiver of Appellate Rights and Challenges to Conviction or Sentence

Defendant has the right to challenge Defendant's conviction and sentence on "direct appeal." This means that Defendant has the right to ask a higher court (the "appeals court") to look at what happened in this case and, if the appeals court finds that the trial court or the parties made certain mistakes, overturn Defendant's conviction or sentence. Also, in some instances, Defendant has the right to file a separate civil lawsuit claiming that serious mistakes were made in this case and that Defendant's conviction or sentence should be overturned.

Defendant understands that Defendant has these rights, but now agrees to give them up. Specifically, Defendant agrees that:

   a) Defendant will not challenge Defendant's conviction on direct appeal or in any other proceeding, including in a separate civil lawsuit; and

   b) Defendant will not challenge any prison sentence of 45 months or less or any court orders relating to forfeiture, restitution, fines or supervised release. This provision is binding even if the Court's Guidelines analysis is different than the one in this Agreement.

The U.S. Attorney agrees that, regardless of how the Court calculates Defendant's sentence, the U.S. Attorney will not appeal any sentence of imprisonment of 45 months or more.

Defendant understands that, by agreeing to the above, Defendant is agreeing that Defendant's conviction and sentence (to the extent set forth in subparagraph (b), above) will be

5
Initialed by Jeannette Norman: _/s/_

final when the Court issues a written judgment after the sentencing hearing in this case. <u>That is, after the Court issues a written judgment, Defendant will lose the right to appeal or otherwise challenge Defendant's conviction and sentence (to the extent set forth in subparagraph (b), above), regardless of whether Defendant later changes Defendant's mind or finds new information that would have led Defendant not to agree to give up these rights in the first place.</u>

Defendant is agreeing to give up these rights at least partly in exchange for concessions the U.S. Attorney is making in this Agreement.

The parties agree that, despite giving up these rights, Defendant keeps the right to later claim that Defendant's lawyer rendered ineffective assistance of counsel, or that the prosecutor or a member of law enforcement involved in the case engaged in misconduct serious enough to entitle Defendant to have Defendant's conviction or sentence overturned.

6. <u>Waiver of Hyde Amendment Claim</u>

Defendant is aware that the Court can award attorneys' fees and other litigation expenses to defendants in certain criminal cases. In exchange for the concessions the U.S. Attorney is making in this Agreement, Defendant waives any claim under the so-called "Hyde Amendment," 18 U.S.C. §3006A, that is based in whole or in part on the U.S. Attorney's agreement in Paragraph 1 to dismiss Count Four.

7. <u>Forfeiture</u>

Defendant understands that the Court will, upon acceptance of Defendant's guilty plea, enter an order of forfeiture as part of Defendant's sentence, and that the order of forfeiture may include assets directly traceable to Defendant's offense, assets used to facilitate Defendant's offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

The assets to be forfeited specifically include, without limitation, the following:

a. $20,099,295 in United States currency, to be entered in the form of an Order of Forfeiture (Money Judgment).

Defendant admits that $20,099,295 is subject to forfeiture on the grounds that it is equal to the amount of money involved in Defendant's offense.

Defendant acknowledges and agrees that the amount of the forfeiture money judgment represents proceeds Defendant obtained (directly or indirectly), and/or facilitating property and/or property involved in, the crimes to which Defendant is pleading guilty and that, due at least in part

6
Initialed by Jeannette Norman: _____

to the acts or omissions of Defendant, the proceeds or property have been transferred to, or deposited with, a third party, spent, cannot be located upon exercise of due diligence, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly, Defendant agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Defendant up to the value of the now missing directly forfeitable assets.

Defendant agrees to consent to the entry of an order of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant understands and agrees that forfeiture shall not satisfy or affect any fine, lien, penalty, restitution, cost of imprisonment, tax liability or any other debt owed to the United States.

If the U.S. Attorney requests, Defendant shall deliver to the U.S. Attorney within 30 days after signing this Plea Agreement a sworn financial statement disclosing all assets in which Defendant currently has any interest and all assets over which Defendant has exercised control, or has had any legal or beneficial interest. Defendant further agrees to be deposed with respect to Defendant's assets at the request of the U.S. Attorney. Defendant agrees that the United States Department of Probation may share any financial information about Defendant with the United States Attorney's Office. 6

Provided the United States Attorney's Office can make the necessary representations as set for the Asset Forfeiture Policy Manual (2025), pursuant to 28 C.F.R. Part 9, the United States Attorney's Office for the District of Massachusetts agrees to submit a restoration request to the Money Laundering and Asset Recovery Section of the Department of Justice, seeking approval for approval for the net proceeds (after disposal and other costs) of any forfeited assets identified in this plea agreement to be restored back to the victims in this case, which may, in turn, satisfy in full or in part any restitution order. Defendant acknowledges that the Attorney General, or his designee, has the sole discretion to approve or deny the restoration request.

8.  Civil Liability

This Plea Agreement does not affect any civil liability, including any tax liability, Defendant has incurred or may later incur due to Defendant's criminal conduct and guilty plea to the charges specified in Paragraph 1 of this Agreement.

9.  Breach of Plea Agreement

Defendant understands that if Defendant breaches any provision of this Agreement,

7
Initialed by Jeannette Norman: /s/

violates any condition of Defendant's pre-trial release or commits any crime following Defendant's execution of this Plea Agreement, Defendant cannot rely upon such conduct to withdraw Defendant's guilty plea. Defendant's conduct, however, would give the U.S. Attorney the right to be released from the U.S. Attorney's commitments under this Agreement, to pursue any charges that were, or are to be, dismissed under this Agreement, and to use against Defendant any of Defendant's statements, and any information or materials Defendant provided to the Government during investigation or prosecution of Defendant's case—even if the parties had entered any earlier written or oral agreements or understandings about this issue.

Defendant also understands that if Defendant breaches any provision of this Agreement or engages in any of the aforementioned conduct, Defendant thereby waives any defenses based on the statute of limitations, constitutional protections against pre-indictment delay, and the Speedy Trial Act, that Defendant otherwise may have had to any charges based on conduct occurring before the date of this Agreement.

10.   Who is Bound by Plea Agreement

This Agreement is only between Defendant and the U.S. Attorney for the District of Massachusetts. It does not bind the Attorney General of the United States or any other federal, state, or local prosecuting authorities.

11.   Modifications to Plea Agreement

This Agreement can be modified or supplemented only in a written memorandum signed by both parties, or through proceedings in open court.

\* \* \*

8
Initialed by Jeannette Norman:

If this letter accurately reflects the agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Plea Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Steven H. Breslow.

Sincerely,

LEAH B. FOLEY
United States Attorney

By: *(signature)*

NEIL L. DESROCHES
Chief, Springfield Branch Office

*(signature)*

STEVEN H. BRESLOW
Assistant U.S. Attorney

9
Initialed by Jeannette Norman *(initials)*

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter and discussed it with my attorney. The letter accurately presents my agreement with the United States Attorney's Office for the District of Massachusetts. There are no unwritten agreements between me and the United States Attorney's Office, and no United States government official has made any unwritten promises or representations to me in connection with my guilty plea. I have received no prior offers to resolve this case.

I understand the crimes I am pleading guilty to, and the maximum penalties for those crimes. I have discussed the Sentencing Guidelines with my lawyer, and I understand the sentencing ranges that may apply.

I am satisfied with the legal representation my lawyer has given me, and we have had enough time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Agreement and whether I should go to trial.

I am entering into this Agreement freely and voluntarily and because I am in fact guilty of the offenses. I believe this Agreement is in my best interest.

_____
Jeannette Norman
Defendant

Date: 8/22/25

I certify that Jeannette Norman has read this Agreement and that we have discussed what it means. I believe Jeannette Norman understands the Agreement and is entering into it freely, voluntarily, and knowingly. I also certify that the U.S. Attorney has not extended any other offers regarding a change of plea in this case.

_____
David Yannetti, Esq.
Attorney for Defendant

Date: 8/22/25

10
Initialed by Jeannette Norman:

*United States v. Louis R. Masaschi and Jeannette Norman*
Docket No. 23-CR-30014-MGM
Statement of Facts:  Jeannette Norman
August 12, 2025

**Introduction**

1. The following facts are based primarily on: (1) records and statements provided by the commercial lenders and entities set forth below; (2) records and statements provided by the tenants set forth below; (3) emails sent and received by the defendants, including those obtained by search warrants.

2. Louis R. Masaschi ("Masaschi") and Jeannette Norman ("Norman") were partners in dozens of limited liability companies ("LLCs") through which they owned primarily commercial and some residential property in Western Massachusetts, Connecticut, and elsewhere.

3. Masaschi and Norman also operated an umbrella real estate development business, JLL Realty Developers, LLC ("JLLRD").

4. According to a Key Bank / Small Business Loan application that Norman executed on November 2, 2017:

   a. Norman graduated from Northeastern University with a degree in criminal justice and hospitality management;

   b. Norman was the co-founder of JLLRD and an affiliated company, JLL Realty Advisors, Inc. ("JLLRA") and has owned these companies since 2010.

   c. Norman "brings diverse experience in both real estate and restaurant entrepreneurship with a strong proficiency in the conduct, interpretation, and presentation of business objectives and deliverables."

   d. In 2007, Norman "began managing with her husband their real estate portfolio of over 500,000 square feet of office and restaurant space."

   e. From 1998 to 2007, Norman was a vice president at Goldman Sachs, where she "managed corporate dining/ managed building facilities and real estate leasing."

   f. Norman and Masaschi have a joint net worth of more than $29 million.

5. Norman's sister, Christine Gendron ("Gendron") was a certified public accountant who worked as JLLRD's Financial Manager and self-described "resident CPA." Masaschi was JLLRD's manager, Secretary of the Commonwealth ("SOC") signatory, and real property

1

Jeannette Norman: _____

signatory. Masaschi, Norman, and Gendron were all authorized signatories on JLLRD's Berkshire Bank Account x-1010. From 2015 to 2022, Gendron received $392,607 in payments for her work at JLLRD.

6. JLLRD had only two other principal employees: MRH and RB.

7. According to MRH:

   a. Norman was an integral part of JLLRD's business, tracked JLLRD's finances, and frequently discussed rent payments with Gendron; and

   b. MRH provided rent checks for some properties directly to Norman, including for 79 Enfield Street, Enfield, CT.

8. According to RB:

   a. Norman was "co-steering the ship"; and

   b. Norman was "the brains behind the decisions" made at JLLRD.

**The Conspiracy and Scheme to Defraud**

9. Through JLLRD and other LLCs, Masaschi, Norman, and Gendron conspired to obtain loans from various financial institutions, including credit unions and mortgage lending businesses (the "Commercial Lenders"), by submitting materially false financial information for properties owned by businesses operated by Masaschi and Norman.

10. This false financial information included:

   a. false rent rolls (lists of tenants and their rental terms) that contained inflated monthly rental payments and lease expiration dates, thus overstating the amount of income for the properties;

   b. false profit and loss statements ("P&Ls") for the properties or their operating LLCs that similarly overstated the amount of income generated by the properties; and

   c. fictitious documents that supported the false rent rolls, such as lease agreements, tenant estoppel certificates, and subordination, non-disturbance, and attornment agreements ("SNDAs")[1] for tenants that similarly contained inflated

---

[1] In commercial real estate loan transactions, lenders frequently require the landlord to provide tenant estoppel certificates and SNDAs for their tenants. A tenant estoppel certificate verifies the

2

Jeannette Norman:

monthly rental payments and lease expiration dates and that bore the signatures of Masaschi or Norman as well as the forged signatures of the tenants.

11. In some instances, Masaschi, Norman, and Gendron provided this false information directly to the commercial lenders. In other instances, Masaschi, Norman, and Gendron provided this false information through their mortgage brokers, including Northmarq Capital ("Northmarq").

12. Based upon this false information, the Commercial Lenders provided loans to companies owned by Masaschi and Norman, who often were required to serve as personal guarantors of the loans.

13. After receiving these loans, Masaschi, Norman, and their companies made some or no payments and ultimately defaulted on the loans, causing substantial losses to the Commercial Lenders.

The Commercial Lenders included the following, with a total actual loss of $20,099,295 and a total attempted loss of $62,632,000.

| Lender | Loan Date | Loan Amount | Collateral Propert(ies) | Actual Loss |
|---|---|---|---|---|
| Security Mutual Life Insurance Co. ("Security Mutual") | 05-24-16 | $ 3,900,000 | 34 Sumner Avenue, Springfield, MA | $ 1,554,378 |
| New York Income Partners, LLC ("NYIP") (LOU-17-001) | 03-01-17 | $ 600,000 | Masaschi's and Norman's membership interested in 294 North Main Street, LLC and Summer Ave, LLC | $ 1,463,051 |
| Columbian Mutual Life Insurance Co. ("Columbian Mutual") | 03-03-17 | $ 2,800,000 | 294 North Main Street, East Longmeadow, MA | None – refinanced by MCREIF SubREIT, LLC ("MCREIF") |

---

terms of a lease agreement between a landlord and a tenant. A SNDA provides certain protections for the tenant and the lender if the landlord/borrower defaults on the loan.

3

Jeannette Norman:

| Lender | Loan Date | Loan Amount | Collateral Propert(ies) | Actual Loss |
|---|---|---|---|---|
| Freedom Credit Union ("FCU") | 03-06-17 | $ 6,250,000 | 113-115 State Street, Springfield, MA<br><br>1139-1155 Main Street, Springfield, MA<br>21 Stockbridge Street, Springfield, MA | $ 5,370,037 |
| NYIP (LOU-17-002) | 06-27-17 | $ 200,000 | Masaschi's and Norman's membership interests in 50 West End, LLC; 21 Stockbridge, LLC; and 109 Hill Crest Ave, LLC | $ 530,058 |
| Northmarq (Broker) | 06-26-17 (attempt) | $2,200,000 | 79-89 Enfield Street, Enfield, CT | None - attempt |
| NYIP (LOU-17-003) | 10-03-17 | $ 2,826,000 | Assignments of leases for 115 State Street, Springfield, MA; 1139-1155 Main Street, Springfield, MA; and other properties | $ 3,647,352 |
| U.S. Income Partners, LLC ("USIP") LOU-17-005 | 01-26-18 | $ 325,000 | Assignments of leases for 34 Sumner Avenue, Springfield, MA and 79 Enfield Street, Enfield, CT | $ 793,822 |
| Community Loan Servicing, LLC d/b/a Silver Hill Funding, LLC ("SHF") | 02-14-18 | $ 231,000 | 7-9 Stockbridge Street, Springfield, MA | $ 255,112 |
| SHF | 02-27-18 | $ 1,050,000 | 760 Sumner Avenue, Springfield, MA | $ 1,068,434 |
| FCU | 03-09-18 | $ 400,000 | 939-941 Columbus Avenue, Springfield, MA | None – attempt |

4

Jeannette Norman: _____

| Lender | Loan Date | Loan Amount | Collateral Propert(ies) | Actual Loss |
|---|---|---|---|---|
| Grand Coast Capital Fund I, LLC ("Grand Coast") | 05-11-18 | $ 350,000 | 939-941 Columbus Avenue, Springfield, MA [60 Shaker Road, East Longmeadow, MA] [30-34 Shaker Road, East Longmeadow, MA] | $ 300,115 |
| Grand Coast | 05-16-18 | $ 765,000 | 939-941 Columbus Avenue, Springfield, MA 60 Shaker Road, East Longmeadow, MA 30-34 Shaker Road, East Longmeadow, MA | $ 778,182 |
| Savings Institute Bank & Trust ("SIBT") | 05-31-18 | $11,000,000 (attempt only) | 167-175 Dwight Street, Longmeadow, MA | None – application declined. |
| SIBT | 05-31-18 | $ 3,000,000 (attempt only) | 249 North Main Street, East Longmeadow, MA | None – application declined. |
| Grand Coast | 06-29-18 | $ 875,000 | 79 Enfield Realty, LLC | $ 561,005 |
| MCREIF SubREIT, LLC, d/b/a Money360 ("MCREIF") | 08-28-18 | $ 4,200,000 | 249 North Main Street, East Longmeadow, MA | $ 1,734,305 |
| AMUSA Commercial Capital ("AMUSA") | 10-17-18 | $ 960,000 (attempt only) | 79 Enfield Street, Enfield, CT | None – no loan issued. |
| Workers Credit Union ("WCU") | 11-01-18 | $11,500,000 | 167-175 Dwight Street, Longmeadow, MA | $ 2,043,444 |
| IP Capital Partners, LLC d/b/a Kore Capital, Ltd. ("IP Capital") | 02-13-19 | $ 6,700,000 (attempt only) | 294 North Main Street, East Longmeadow, MA | None - no loan issued. |
| Northmarq (Broker) | 05-24-19 (attempt) | $2,500,000 | 79-89 Enfield Street, Enfield, CT | None - attempt |
| **Total Actual Loss:** | | | | **$20,099,295** |

5

Jeannette Norman

| Lender | Loan Date | Loan Amount | Collateral Propert(ies) | Actual Loss |
|---|---|---|---|---|
| Total Attempted Loss: | | $62,632,000 | | |



6

Jeannette Norman: